[Cite as *State v. Linkous*, 2013-Ohio-5853.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 12CA3517 |
| vs. | : | |
| RAYMOND LINKOUS, | : | DECISION AND JUDGMENT ENTRY |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

COUNSEL FOR APPELLANT:     Luke Brazinski and Cassity Brazinski, 602 Chillicothe
                          Street, Suite 700A, Portsmouth, Ohio 45662

COUNSEL FOR APPELLEE:      Mark E. Kuhn, Scioto County Prosecuting Attorney, and
                          Julie Hutchinson, Scioto County Assistant Prosecuting
                          Attorney, 612 6th Street, Room E, Courthouse Annex,
                          Portsmouth, Ohio 45662

CRIMINAL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED: 12-19-13
ABELE, J.

{¶ 1}   This is an appeal from a Scioto County Common Pleas Court judgment of

conviction and sentence.   A jury found Raymond Linkous, defendant below and appellant herein,

guilty of: (1) aggravated murder in violation of R.C. 2903.01(A); (2) aggravated murder; (3)

murder; (4) aggravated arson; (5) arson; (6) three counts of tampering with evidence; (7)

kidnapping; and (8) conspiracy to aggravated murder/murder.

**{¶ 2}** Appellant assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED BY ALLOWING THE IMPROPER AUTHENTICATION OF DNA EVIDENCE."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN IT RULED AGAINST DEFENDANT'S MOTION TO DISMISS THE KIDNAPPING CHARGE. THE TRIAL COURT FURTHER ERRED IN FAILING TO MERGE THE KIDNAPPING CHARGE WITH THE AGGRAVATED MURDER CHARGE."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN IT INFORMED A WITNESS FOR THE DEFENDANT [SHE WAS] NOT REQUIRED TO TESTIFY."

FOURTH ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN REFUSING TO GIVE THE DEFENDANT A MANSLAUGHTER INSTRUCTION."

FIFTH ASSIGNMENT OF ERROR:

"THE CONVICTION FOR AGGRAVATED ARSON WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶ 3}** On March 7, 2012, appellant, David Gerald, Thomas Steinhauer and Felipe Lopez met at Lopez's house. Appellant, Gerald and Steinhauer informed Lopez that they were going to a friend's house in Otway. They, however, never made it to Otway. Instead, Lopez was stabbed with a knife, struck in the head with a hatchet, and burned alive inside a pickup truck.

**{¶ 4}** Law enforcement officials quickly suspected appellant's involvement in Lopez's murder. When law enforcement officials questioned appellant, appellant initially expressed

surprise and indicated that he had no knowledge about Lopez's murder. He eventually admitted his involvement, however, but did not immediately admit the extent of his involvement. First, he claimed that he did not set fire to the pickup truck and that he simply drove Gerald and Steinhauer to the pickup truck. Appellant further stated that he was unaware that the pickup truck contained a body. Later, however, appellant admitted that he was with Gerald and Steinhauer in the pickup truck. Appellant alleged that Steinhauer stabbed Lopez and that Gerald struck him on the head with a hatchet. Appellant admitted that it was his idea to burn the pickup truck and that he poured the gasoline and set the fire.

{¶ 5} On March 26, 2012, the Scioto County Grand Jury returned an indictment that charged appellant with (1) aggravated murder in violation of R.C. 2903.01(A); (2) aggravated murder in violation of R.C. 2903.01(B); (3) murder in violation of R.C. 2903.02(B); (4) aggravated arson in violation of R.C. 2909.02(A)(1); (5) arson in violation of R.C. 2909.03(A)(1); (6) three counts of tampering with evidence in violation of R.C. 2921.12(A)(1); (7) kidnapping in violation of R.C. 2905.01(A)(2); and (10) conspiracy to aggravated murder/murder in violation of R.C. 2923.01/2903.01(A)(1)/(A)(2)/2903.02(B).

{¶ 6} Beginning on September 10, 2012 and continuing through September 13, 2012, the trial court held a jury trial. Before the trial began, the state informed the court that the hatchet and knife had been lost after the Bureau of Criminal Investigation (BCI) analyzed the items. The state indicated that it nevertheless intended to present testimony from the analyst who tested the hatchet and knife. Appellant argued that the state should not be permitted to introduce evidence obtained from the hatchet and knife because "without the actual weapon there's no way to verify that this, in fact, [is] the same thing we're all talking about." The trial court, however, stated that it would

admit the analyst's testimony because the lost evidence affected the analyst's credibility and weight, not the admissibility. Appellant continued to object and stated that the "chain of custody has been lost." The state asserted that even if the chain of custody had been broken, the hatchet and knife were tested prior to the chain's break. The court agreed with the state that because the chain of custody remained intact until the items had been tested, the results of the tests would be admissible.

{¶ 7} At trial, the state presented the following evidence. On March 7, 2012, Lopez told his wife that Steinhauer, Gerald, and appellant were going to Otway to meet a friend. The four left in a maroon Chevy S10 pickup truck.

{¶ 8} Later that evening, witnesses observed a maroon Chevy S10 pickup truck and a white car parked along Junior Furnace-Powellsville Road. Shortly after 8:00 p.m., Jeff Huffman noticed a vehicle on fire. Huffman tried to get close to the vehicle but "it was so hot and it seemed like every time [he] got over close to it something up front, whether it be a tire, or whatever, would blow up." Huffman returned to his house and called 911. Huffman informed the dispatcher that he "watched somebody set [the vehicle] on fire."

{¶ 9} When emergency personnel arrived, they noticed a body inside the truck's passenger compartment. Law enforcement officials learned that the pickup truck contained Lopez's body.

{¶ 10} When investigators spoke with appellant, he blamed Steinhauer and Gerald for Lopez's murder. Appellant denied any knowledge of how the murder occurred. Appellant claimed that Steinhauer and Gerald arrived at appellant's house after the murder and asked appellant to follow them in his car and give them a ride back to the house. Appellant stated that he did not know that the truck contained a body.

{¶ 11} Appellant claimed that Steinhauer said that he stabbed Lopez in the chest and Gerald struck Lopez in the head with a hatchet. Appellant asserted that he had never seen a hatchet and that he had been following the truck when Steinhauer stabbed Lopez and Gerald struck him with the hatchet. Appellant alleged that Steinhauer and Gerald set the truck on fire.

{¶ 12} Later, appellant admitted that he was in the back of the pickup truck, but continued to deny that he struck Lopez with the hatchet. Appellant claimed that he had blood on his pants because Gerald threw the hatchet and it brushed against his leg.

{¶ 13} Appellant also admitted that he set fire to the truck, but he believed that Lopez was dead when he set the fire. The coroner testified, however, that Lopez was alive when appellant set the fire and Lopez would have been breathing and "gurgling."

{¶ 14} The coroner explained that Lopez's death resulted from "multiple stab and chop wounds of the head and torso" and that "inhalation thermal injuries" contributed to Lopez's death. If Lopez's body had not been burned, he "would have fully expected Mr. Lopez to have died eventually from his [stab and chop wound] injuries."

{¶ 15} BCI forensic scientist Raymond Peoples testified that he analyzed the DNA evidence obtained from the hatchet. Peoples stated that he could not exclude appellant as one of the contributors to the DNA obtained from the hatchet.

{¶ 16} During the defense's case, appellant sought to call Connie Hammond. The state indicated that it believed Hammond would incriminate herself if she testified. The prosecutor informed the court that he believed Hammond would testify that she drove appellant to the victim's home during the afternoon of March 7, 2012. The prosecutor further indicated that the reason Hammond rendezvoused with appellant was to purchase cocaine. The prosecutor thus asserted

that Hammond may incriminate herself for "aggravated trafficking in cocaine [and] complicity to

aggravated murder."

{¶ 17} The court then engaged in the following colloquy with Hammond:

"* * * [Y]ou have the absolute right to remain silent, and to not incriminate yourself. Okay. What the Prosecutor is saying if you—if the testimony goes as he thinks it will that you could be indicted by the grand jury. And it's this Court's advice to you that you should probably consult with an attorney before you could possibly incriminate yourself. Do you understand what I'm saying?
A. (No audible response)
THE COURT: Okay. Do you wish to testify without consulting an attorney?
A. No.
THE COURT: You wish not to testify?
A. No."

{¶ 18} Appellant's counsel also questioned Hammond whether she intended to testify, and

she stated, "I don't know what to do." The court then informed Hammond: "I'm not going to

allow you to incriminate yourself without the rights of a lawyer." The court continued:

"It's your choice. If you wish to go ahead and testify without the advice of a lawyer the Prosecutor says if it goes the way he believes it will be then—then your case would be presented to the grand jury for indictment for possible drug trafficking and possession of drugs, and possibly being involved in this murder by driving the dead body around. So I don't want you to make any comments on any of that. Okay. So you—do you wish to talk with a lawyer, or do you wish to just be—be relieved from any responsibility at this time."

Hammond opted not to testify.

{¶ 19} Before the court instructed the jury, appellant requested an involuntary

manslaughter instruction because "[appellant] testified that he thought [the victim] was dead."

Appellant argued that because he believed the victim was dead when he set fire to the vehicle, then

"that's not a voluntary intentional act of killing." The court denied appellant's request.

{¶ 20} On September 17, 2012, the jury found appellant guilty of all charges. On

September 20, 2012, the trial court sentenced appellant to: (1) life without parole for the R.C.

2903.01(A) aggravated murder offense; (2) ten years for committing aggravated arson; (3) eighteen

months for committing arson; (4) three years for each count of tampering with evidence in

violation of R.C. 2921.12(A)(1); and (5) ten years for kidnapping.   The court merged: (1) the R.C.

2903.01(B) aggravated murder, the R.C. 2903.02(B) murder, and the conspiracy to commit

aggravated murder/murder offenses with the R.C. 2903.01(A) aggravated murder offense; and (2)

the tampering with evidence offense involving the motor vehicle with the arson offense.   The

court ordered the sentences to be served consecutively for a total sentence of life without parole

plus twenty-nine years.   This appeal followed.

I

DNA EVIDENCE

{¶ 21}  In his first assignment of error, appellant asserts that the trial court erred by

permitting the state to introduce the DNA evidence obtained from the hatchet.   He contends that

because the state lost the hatchet, the state could not properly authenticate the DNA evidence.

A

STANDARD OF REVIEW

{¶ 22}  The admission or exclusion of evidence generally rests within the trial court's sound

discretion.   E.g., State v. Robb, 88 Ohio St.3d 59, 68, 723 N.E.2d 1019 (2000).   Absent an abuse

of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of

evidence.   E.g., State v. Martin, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985).   Generally, an

abuse of discretion connotes more than an error of law or judgment; rather, it implies that a court's

attitude is unreasonable, arbitrary, or unconscionable.   E.g., State v. Adams, 62 Ohio St.2d 151,

157, 404 N.E.2d 144 (1980).

## B

## AUTHENTICATION

{¶ 23} Before a trial court may admit evidence, Evid.R. 901 requires the proponent to identify or authenticate the evidence. Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The proponent may identify or authenticate evidence by presenting "[t]estimony that a matter is what it is claimed to be." Evid.R. 901(B)(1).

{¶ 24} Testimony that documents an object's chain of custody is one means of demonstrating that "a matter is what it is claimed to be." "Chain of custody is a part of the authentication and identification mandate set forth in Evid.R. 901, and the state has the burden of establishing the chain of custody of a specific piece of evidence." State v. Brown, 107 Ohio App.3d 194, 200, 668 N.E.2d 514 (3rd Dist. 1995); accord State v. Hamilton, 10th Dist. Nos. 10AP–543 & 10AP–544, 2011-Ohio-3305, ¶16. "The state's burden, however, is not absolute." Brown, 107 Ohio App.3d at 200. "The state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur. Moreover, breaks in the chain of custody go not to the admissibility of evidence, but to the weight afforded it." State v. Blevins, 36 Ohio App.3d 147, 150, 521 N.E.2d 1105 (10th Dist. 1987) (citations omitted); State v. Wallace, 10th Dist. Franklin No. 08AP-2, 2008-Ohio-5260, ¶27 ("[A]ny breaks in the chain of custody go to the credibility or weight afforded to the evidence and not to its admissibility."). "'The state, therefore,

is not required "to negate all possibilities of substitution or tampering."'" State v. Corder, —

Ohio App.3d —, 969 N.E.2d 787, 2012-Ohio-1995 (4th Dist.), ¶15, quoting State v. Lenoir, 5th

Dist. Delaware No. 10CAA010011, 2010-Ohio-4910, ¶19, quoting State v. Moore, 47 Ohio

App.2d 181, 183, 353 N.E.2d 866 (9th Dist. 1973).


{¶ 25} Additionally, "[t]he 'length' of the chain of custody depends on the purpose for

which the evidence is offered." 2 Gianelli, Evidence, Section 901.15 (3d Ed. 2010). If the

evidence is offered to show the results of a chemical analysis, then the length of the chain extends

to the moment the chemical analysis was conducted. State v. Conley, 32 Ohio App.2d 54, 288

N.E.2d 296 (3rd Dist. 1971). As the Conley court explained:

> "To identify a particular item * * * as being part of a pertinent incident in
> the past usually requires the showing of a continuous chain of custodians up to the
> material moment. When a chemical analysis is involved * * * the material moment
> is the moment of analysis, since this provides the basis for the expert testimony and
> makes that testimony relevant to the case."

Thus, "[t]he loss or destruction of [evidence] after chemical analysis [does] not affect the relevance

of the expert's testimony concerning the nature of the [lost evidence]." Gianelli, supra, citing

United States v. Bailey, 277 F.2d 560, 565 (C.A.7, 1960).

{¶ 26} Furthermore, "the prosecution generally is not required to introduce real evidence in

order to prove its case." Id.

> "'It is not always necessary that tangible evidence be physically admitted at
> trial. * * * Even when evidence is available it need not be physically offered.
> Thus, the grand larceny of an automobile may be established merely on competent
> testimony describing the stolen vehicle without actually producing the automobile
> before the trier of fact.'"

Id., quoting Holle v. State, 26 Md. App. 267, 274, 337 A.2d 163 (1975).

{¶ 27} In the case sub judice, the state offered testimony that documented the hatchet's chain of custody from the moment of discovery through the time the analyst conducted the testing. Steinhauer led detectives to the area in Kentucky where appellant and the others disposed of the hatchet.   Law enforcement officials photographed the hatchet before disturbing it from the scene. The hatchet was routed from a Kentucky law enforcement official, to Detective Triggs, to Detective Conkel, and then to Deputy Terry.   Deputy Terry then transported the hatchet to BCI for testing.   The BCI analyst testified that Deputy Terry delivered the hatchet to the BCI offices and that the hatchet was kept in the evidence locker at all times, except during testing.     After testing, BCI released the items to be returned to the Scioto County Sheriff's Office.   Thus, the state documented the hatchet's chain of custody from the time of its discovery through the moment the BCI analyst tested the DNA evidence obtained from the hatchet.   Establishing this chain of custody sufficiently demonstrates that the DNA evidence is the DNA evidence that it obtained from the hatchet.

{¶ 28} The fact that the state lost the hatchet after the analyst tested the DNA evidence does not render the DNA evidence inadmissible.   The subsequent custody and presentation into evidence of the hatchet "is not as important as the critical moment-the moment of the [DNA] analysis which formed the basis for the [BCI analyst's] subsequent testimony."   Conley, 32 Ohio App.2d at 61; State v. Winfield, 4th Dist. Ross No. 1641 (Feb. 7, 1991) (stating that "the fact that it was not shown who had custody of the cocaine during its transport back to Chillicothe is not particularly relevant in the case at bar since analysis of the powder had already occurred"). Because the state documented the hatchet's chain of custody up through the moment BCI analyzed

it, the state properly identified the DNA evidence discovered on the hatchet.   Moreover, nothing required the state to physically produce the hatchet as evidence at trial.   Gianelli, supra.

{¶ 29} Although appellant argues in passing that the hatchet was unavailable to him for DNA testing, he has not raised any argument that the state failed to preserve materially exculpatory evidence.   Thus, we do not consider whether the state violated his due process rights by failing to preserve the hatchet for DNA testing.

{¶ 30} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's first assignment of error.

II

SUFFICIENCY OF EVIDENCE

{¶ 31} In his second assignment of error, appellant asserts that the trial court erred by overruling his Crim.R. 29(A) motion for judgment of acquittal regarding the kidnapping charge. Appellant contends that the state failed to present sufficient evidence to show that he restrained the victim's liberty.   Within this assignment of error, appellant also argues that the trial court erred by failing to merge the kidnapping and aggravated murder charges.

A

CRIM.R. 29(A)

{¶ 32} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence."   State v. Tenace, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386 (2006), ¶37.   When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a

reasonable doubt.    State v. Thompkins, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997) (stating

that "sufficiency is a test of adequacy"); State v. Jenks, 61 Ohio St.3d 259, 274, 574 N.E.2d 492

(1991).    The standard of review is whether, after viewing the probative evidence and inferences

reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact

could have found all the essential elements of the offense beyond a reasonable doubt.    Jackson v.

Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Jenks, 61 Ohio St.3d at 273.

Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but

whether, if believed, the evidence against a defendant would support a conviction."    Thompkins,

78 Ohio St.3d at 390 (Cook, J., concurring).

{¶ 33} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must

construe the evidence in a light most favorable to the prosecution.    State v. Hill, 75 Ohio St.3d

195, 205, 661 N.E.2d 1068 (1996); State v. Grant, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993).

A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless

reasonable minds could not reach the conclusion that the trier of fact did.    State v. Tibbetts, 92

Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); State v. Treesh, 90 Ohio St.3d 460, 484, 739 N.E.2d

749 (2001).

{¶ 34} R.C. 2905.01(A)(2) sets forth the essential elements of kidnapping as charged in

appellant's indictment:

> "No person, by force, threat, or deception * * * shall remove another from
> the place where the other person is found or restrain the liberty of the other person,
> for any of the following purposes: * * * * (2) To facilitate the commission of any
> felony or flight thereafter[.]"

{¶ 35} In the case at bar, appellant contests whether the state presented sufficient evidence

to establish that he restrained the victim's liberty.   Appellant asserts: "Not [sic] testimony was ever presented that the victim was restrained[,] bound, tied or otherwise coerced to enter or remain in the truck in which he ultimately was killed."   Appellant contends that because the victim entered the truck "of his own free will," then appellant could not have kidnapped the victim. Appellant further argues that because he was seated in the bed of the pickup truck, he was "incapable of restricting the victim's movement."

{¶ 36}  The state asserts that appellant removed the victim from his home by deception and, thus, committed the offense of kidnapping.   The state observes that testimony exists that appellant and his accomplices led the victim to believe that they were going to visit a friend in Otway.   The state further notes that testimony exists that appellant and his two accomplices never intended to take the victim to Otway, but instead deceived him into going for the ride so the threesome could kill the victim.   The state additionally argues that appellant and his two accomplices restrained the victim after attacking him with a hatchet and knife, and then transported the victim from Ohio to Kentucky, then back to Ohio where they set fire to the vehicle with the victim inside.

{¶ 37}  In State v. Johnson, 112 Ohio St.3d 210, 2006-Ohio-6405, 858 N.E.2d 1144 (2006), the Ohio Supreme Court held that sufficient evidence supported a defendant's kidnapping conviction, even though the defendant mistakenly believed the victim was dead before he "gagged and hogtied the victim" and concealed the victim's body in the basement.   In Johnson, the defendant was charged with aggravated murder and kidnapping of a thirteen-year old child.   On appeal, he asserted that sufficient evidence did not support his kidnapping conviction because the evidence showed the he "beat [the victim] to death" in the living room before he restrained the victim and moved his body to the basement.   Id. at ¶11.   The defendant argued "that he could not

have kidnapped [the victim], because [the victim] died before [the defendant] hogtied him." Id. at

¶40. In rejecting the defendant's argument, the court explained: "* * * [T]he evidence does not

support [the defendant's] contention that [the victim] had died before being restrained. [The

coroner] testified that [the victim] was still alive when [the defendant] tied his hands and feet, and

this testimony supports the jury's finding that [the defendant] restrained [the victim] of his liberty."

 Id. at ¶41.

{¶ 38} The case at bar involves similar facts. Like the defendant in Johnson, appellant

argues that he believed that the victim was dead after he and his accomplices struck him in the

head with a hatchet and stabbed him multiple times. The coroner, however, testified that the

victim was alive when appellant and his accomplices concealed his body in the pickup truck and

drove around before setting the fire and ultimately killing the victim. Thus, just like the scenario

in Johnson, in the case sub judice the evidence shows that the victim was not dead when appellant

and his accomplices restrained the victim. Thus, the evidence supports the jury's finding that

appellant and his accomplices restrained the victim's liberty.

{¶ 39} Moreover, because sufficient evidence supports the jury's finding that appellant

restrained the victim's liberty, we need not consider the state's alternate theory of kidnapping by

deception.

B

MERGER

{¶ 40} Appellant next argues that the trial court erred by failing to merge his kidnapping

and aggravated murder convictions. He asserts that he did not have a separate animus to commit

kidnapping.

{¶ 41} Initially, we observe that appellant did not argue during the trial court proceedings that his aggravated murder convictions should merge with his kidnapping conviction. Consequently, appellant waived all but plain error. State v. Carsey, 4th Dist. Athens Nos. 12CA37 and 12CA38, 2013-Ohio-4482, ¶5; State v. Winn, 173 Ohio App.3d 202, 2007-Ohio-4327, 877 N.E.2d 1020, (2nd Dist.), ¶26. The Ohio Supreme Court, however, has recognized that a trial court plainly errs by imposing multiple sentences for allied offenses of similar import. State v. Underwood, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶31.

{¶ 42} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." Underwood at ¶23. The statute provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 43} "The question of whether offenses should merge under R.C. 2941.25 ordinarily presents a question of law we review de novo." State v. Delawder, 4th Dist. Scioto App. No. 10CA3344, 2012–Ohio–1923, ¶38; accord State v. Williams, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶¶26-28. In State v. Nguyen, 4th Dist. Athens No. 12CA14, 2013–Ohio–3170, ¶103, we set forth the analysis that applies when determining if offenses should merge under R.C. 2941.25:

"'Through a series of opinions the Supreme Court of Ohio has advised and re-advised lower courts on the difficult task of applying Ohio's multiple-count statute to determine which criminal convictions require merger.' Delawder at ¶39. In the plurality decision of State v. Johnson, 128 Ohio St.3d 153, 2010–Ohio–6314, 942 N.E.2d 1061, the Court expressly overruled its then current test for merger. Under the new test, the trial court must first determine 'whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other.' (Emphasis sic). Johnson at ¶48. If the offenses are so alike that the same conduct can subject the accused to potential culpability for both, they are 'of similar import' and the court must proceed to the second step. The court must then determine whether the offenses in fact were committed by the same conduct, i.e., committed as a single act with a single animus. Id. at ¶49. If so, merger is necessary. However, if the offenses resulted from separate acts or were performed with a separate animus, or if the commission of one offense will never result in the commission of the other, the offenses will not merge. Id. at ¶51."

Accord State v. Washington, — Ohio St.3d —, 2013-Ohio-4982, — N.E.2d —.

1

Similar Import

**{¶ 44}** In the case at bar, appellant contends that his aggravated murder and kidnapping offenses are of similar import. The state charged appellant with aggravated murder under R.C. 2903.01(A) and (B). Those statutes read:

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
(B) No person shall purposely cause the death of another or the unlawful

termination of another's pregnancy while committing or attempting to commit, or

while fleeing immediately after committing or attempting to commit, kidnapping,

rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary,

burglary, trespass in a habitation when a person is present or likely to be present,

terrorism, or escape.

The state charged appellant with kidnapping pursuant to R.C. 2905.01(A)(2), which states:

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter[.]"

The Ohio Supreme Court "has repeatedly held that aggravated murder and kidnapping are not allied offenses of similar import under R.C. 2941.25." State v. Elmore, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶51, citing State v. Coley, 93 Ohio St.3d 253, 265, 754 N.E.2d 1129 (2001); State v. Keenan, 81 Ohio St.3d 133, 154, 689 N.E.2d 929 (1998); State v. Jells, 53 Ohio St.3d 22, 32-33, 559 N.E.2d 464 (1990); State v. Powell, 49 Ohio St.3d 255, 261, 552 N.E.2d 191 (1990), superseded by constitutional amendment on other grounds as noted in State v. Smith, 80 Ohio St.3d 89, 102, 684 N.E.2d 668, fn.4 (1997); State v. Buell, 22 Ohio St.3d 124, 141-142, 489 N.E.2d 795 (1986); State v. Logan, 60 Ohio St.2d 126, 135, 397 N.E.2d 1345 (1979) ("[W]here murder * * * is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense."). "A kidnapping can take place without an aggravated murder, and an aggravated murder can take place without a kidnapping." Keenan, 81 Ohio St.3d at 154. However, the Ohio Supreme Court's cases holding that aggravated murder and kidnapping are not allied offenses of similar import pre-date Johnson. Thus, we must determine whether the holdings remain valid in light of the Johnson merger analysis.

{¶ 45} In Jells, the court relied upon the merger test adopted in Newark v. Vazirani:

"The two-tiered test for determining whether two or more offenses are allied offenses of similar import was recently reviewed by this court in Newark v. Vazirani (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, syllabus, where we stated that ' * * * [i]n the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses. (State v. Blankenship [1988], 38 Ohio St.3d 116, 117, 526 N.E.2d 816, 817, approved and followed.)'"

Jells, 53 Ohio St.3d at 32-33. The court then applied the Vazirani test and concluded that

kidnapping and aggravated murder are not similar offenses:

"A comparison of the elements of kidnapping and aggravated murder clearly

shows that they are not similar. Kidnapping, as charged in this case, involves the

removing of a person by force, threat, or deception from the place where he is

found, or restraining him of his liberty, to facilitate the commission of a felony or

the flight thereafter and/or to terrorize or inflict serious physical harm on the victim.

R.C. 2905.01(A)(2) and (3). The aggravated murder count in this case charged

appellant with purposely causing the death of another while committing or

attempting to commit kidnapping. R.C. 2903.01(B)."

Id. at 33.

{¶ 46} In State v. Rance, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999), the court overruled

Vazirani test that compared the elements of the offenses in light of the facts involved. Id. at

syllabus and 637 (observing that Vazirani "compared the elements of the crimes by reference to the

particular facts alleged in the indictment"). In Johnson, however, the court overruled Rance.

Johnson at syllabus. The test the court now applies is similar to the Vazirani analysis that

considered the facts of the case to determine whether two or more offenses are of similar import.

We believe, therefore, that the Jells line of cases survives Johnson. Furthermore, the Ohio

Supreme Court has not explicitly overruled the Jells holding that aggravated murder and

kidnapping are offenses of dissimilar import.

{¶ 47} Additionally, kidnapping and aggravated murder as charged in appellant's

indictment are not so alike that the same conduct can subject appellant to potential culpability for

both offenses. Johnson, supra. In the case at bar, the indictment charged that appellant

purposely, and with prior calculation and design, caused the victim's death. The indictment also

charged appellant with purposely causing the victim's death while committing or attempting to commit aggravated arson or arson. The kidnapping charge alleged that appellant "knowingly by force and threat" removed the victim from the place where he was found or restrained the victim's liberty to facilitate the commission of any felony of flight thereafter. Appellant's murder convictions resulted from his participation, either as a principal or as an aider and abettor, in inflicting the victim's stabbing and chop-style wounds and from setting the car on fire with the victim's body inside. Appellant's kidnapping conviction resulted from his participation in restraining and transporting the still-alive victim's body from Ohio, to Kentucky, and back to Ohio while disposing of evidence and obtaining gasoline to set the car on fire. Consequently, appellant did not commit aggravated murder and kidnapping with the same conduct. Thus, appellant's aggravated murder and kidnapping offenses are not of similar import.

2

Separate Animus

{¶ 48} Even if we assume for purposes of argument that appellant's aggravated murder and kidnapping convictions are of similar import, appellant nevertheless committed the offenses separately or with a separate animus. Thus, appellant may be convicted and sentenced for both crimes.

{¶ 49} The Ohio Supreme Court has guided Ohio courts as follows to determine whether a defendant committed kidnapping and another offense of similar import with a separate animus:

> "(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense

sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a

substantial increase in risk of harm separate and apart from that involved in the

underlying crime, there exists a separate animus as to each offense sufficient to

support separate convictions."

State v. Logan, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), syllabus; accord Johnson, 112 Ohio

St.3d 210, ¶46.

{¶ 50}  In Johnson, the court applied these guidelines and determined that the defendant had

a separate animus to commit kidnapping.   The court thus concluded that the trial court could

convict and sentence the defendant for both kidnapping and aggravated murder.   The court

explained:

> "Here, the record supports the conclusion that [the defendant]'s kidnapping
> of [the victim] had a significance and an animus independent of [the victim]'s
> murder. [The victim's mother] testified that she found [the victim] hogtied and
> lying in a blanket behind her washing machine in the basement of her home. [The
> coroner] testified that [the victim] lived for a time sufficient for his skin to react to
> the shoelaces.   Even if [the victim] had lived for only a few minutes after [the
> defendant] hogtied him, sufficient evidence existed for the jury to find that [the
> defendant] had intended to prevent [the victim] from getting assistance for his
> injuries, had he regained consciousness.   Moreover, sufficient evidence existed for
> the jury to infer that [the defendant] carried [the victim], while [the victim] still
> lived, to the basement in order to confine him in secret and to prevent anyone from
> finding him and rendering aid.
> Hence, the jury could reasonably conclude that when [the defendant]
> restrained [the victim] and hid him in the basement, he committed an act that had
> significance independent of, and an animus separate from, murder."

Id. at ¶47-48.

{¶ 51}  Similarly, in the case sub judice, the evidence supports a conclusion that appellant

had a separate animus independent of the victim's murder.   The victim's body was discovered in a

burnt pickup truck.   The coroner testified that the victim was alive when appellant set the fire.

Appellant and his accomplices kept the still-alive victim secretly confined in the pickup truck

while they drove around disposing of evidence and purchasing the gasoline.   Logan, 60 Ohio St.2d

at 135 ("Secret confinement, such as in an abandoned building or nontrafficked area, without the

showing of any substantial asportation, may, in a given instance, also signify a separate animus and

support a conviction for kidnapping apart from the commission of an underlying offense."); State

v. Lawson, 64 Ohio St.3d 336, 349, 595 N.E.2d 902 (1992) ("[T]he record indicates prolonged

restraint and significant movement; Martin was transported for several hours over a great distance

involving three counties.   The prolonged deception over several hours was not incidental to

Martin's murder and clearly constituted a separate and distinct act.").   Thus, the jury very

reasonably could have determined that when appellant and his accomplices secretly confined the

victim and restrained his liberty, appellant "committed an act that had significance independent of,

and an animus separate from, murder."

{¶ 52}   Accordingly, based upon the foregoing reasons, we hereby overrule appellant's

second assignment of error.

III

WITNESS

{¶ 53}   In his third assignment of error, appellant asserts that the trial court erred by

informing a defense witness that she was not required to testify and potentially incriminate herself.

{¶ 54}   "'When a witness asserts a privilege against self-incrimination, a court may not rely

upon the witness's claim alone.   State v. Landrum (1990), 53 Ohio St.3d 107, 120, 559 N.E.2d

710, 726. The court has a duty to determine if the witness's refusal to answer is justified. Id.'"

State v. Jackson, 92 Ohio St.3d 436, 447, 751 N.E.2d 946 (2001), quoting State v. Reiner, 89 Ohio

St.3d 342, 352, 731 N.E.2d 662 (2000)[1]; accord Hoffman v. United States, 341 U.S. 479, 486-487,

71 S.Ct. 814, 95 L.Ed. 1118 (1951).

**{¶ 55}** A witness's refusal to answer is justified under the privilege against

self-incrimination when answering would support a conviction or would "furnish a link in the

chain of evidence needed to prosecute the [witness]." Hoffman, 341 U.S. at 486. "[I]t need only

be evident from the implications of the question, in the setting in which it is asked, that a

responsive answer to the question or an explanation of why it cannot be answered might be

dangerous because injurious disclosure could result." Id., at 486-487, 71 S.Ct. 814. The

privilege's protection extends only to witnesses who have "reasonable cause to apprehend danger

from a direct answer." Id. at 486. Moreover, "'[t]he fact that a witness decides to invoke his or

her Fifth Amendment right not to testify does not deny the defendant seeking to call that witness a

fair trial.'" State v. Parker, 8th Dist. Cuyahoga No. 96941, 2012-Ohio-362, ¶29, quoting United

States v. Staplton, 297 Fed.Appx. 413 (C.A.6, 2008).

**{¶ 56}** If a court determines that a witness is mistaken about the danger of incrimination,

the court must then require the witness to answer the question. Hoffman, 341 U.S. at 486.

> "However, when the court is satisfied that the witness's refusal to answer is
> justified, a court may either excuse the witness from testifying or, upon the written

---

[1] The United States Supreme Court reversed Reiner "[b]ecause the Supreme Court of Ohio mistakenly held that the witness' assertion of innocence deprived her of her Fifth Amendment privilege against self-incrimination." Ohio v. Reiner, 532 U.S. 17, 22, 121 S.Ct. 1252, 1255 (2001); accord State v. Reiner, 93 Ohio St.3d 601, 604, 757 N.E.2d 1143 (2001) ("Pursuant to Ohio v. Reiner, we reverse Reiner I to the extent that it held that Batt lacked a valid Fifth Amendment privilege against self-incrimination.").

request of the prosecuting attorney, may compel the witness to answer by granting
that person immunity from prosecution for any criminal act about which the person
may testify."

Reiner, 89 Ohio St.3d at 353, citing R.C. 2945.44; accord State v. Kirk, 72 Ohio St.3d 564, 651

N.E.2d 981 (1995), paragraph one of the syllabus.

**{¶ 57}** Thus, a court has discretion to excuse a witness from testifying to protect the

witness's privilege against self-incrimination.   A reviewing court will not, therefore, reverse a trial

court's decision to excuse a witness from testifying absent an abuse of discretion.   State v.

Williams, 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶63.

**{¶ 58}** In the case at bar, we believe that the trial court properly questioned the witness to

ascertain whether she may have incriminated herself by testifying.   The case authority clearly

states that a trial court has a duty to determine whether a witness has a valid Fifth Amendment

privilege.   That is precisely what the trial court did in the case sub judice.   Once the court

ascertained that the witness possessed a valid Fifth Amendment privilege, it had discretion to

excuse the witness from testifying.[2]   Reiner; Kirk; Williams at ¶66.   Nothing in the record

indicates that the court abused its discretion by excusing the witness from testifying.   Furthermore,

the trial court did not deprive appellant of a fair trial by excluding the witness testimony.   Parker.

**{¶ 59}** We believe that appellant's reliance on State v. Byrd, 4th Dist. Scioto No.

10CA3390, 2012-Ohio-1138, is misplaced.   Byrd involved the spousal privilege under Evid.R.

601(B), not the privilege against self-incrimination.   In Byrd, we determined that the trial court

unnecessarily questioned the spouse regarding her assertion of the spousal privilege and improperly

---

[2] Appellant has not argued that the trial court improperly determined that the witness possessed a valid Fifth
Amendment privilege.    We therefore do not address this issue and express no opinion on its merits.

excluded her testimony. We further concluded the exclusion of the spouse's testimony harmless beyond a reasonable doubt due to the presence of overwhelming evidence to support the defendant's conviction.

{¶ 60} In the case at bar, we did not determine that the trial court unnecessarily questioned the witness regarding the privilege against self-incrimination. Additionally, we did not conclude that the trial court improperly excluded the witness's testimony. Accordingly, based upon the foregoing reasons, we hereby overrule appellant's third assignment of error.

IV

INVOLUNTARY MANSLAUGHTER INSTRUCTION

{¶ 61} In his fourth assignment of error, appellant asserts that the trial court erred by refusing to give an involuntary manslaughter jury instruction. Appellant contends that because he reasonably believed that the victim died before he set the fire, an involuntary manslaughter instruction is appropriate. Appellant argues that "there was sufficient evidence to support a theory that the defendant acted not with prior calculation and design to kill the victim but rather was the proximate cause of the death of the victim when defendant acted to destroy evidence, as the defendant by the testimony of the State's own witness could have reasonably believed the victim was already dead."

{¶ 62} Determining whether a lesser included offense instruction is warranted involves a two-part test. State v. Deanda, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶6. First, a trial court must determine if the requested charge is a lesser included offense of the charged crime. Id.; State v. Kidder, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). Second, the court must

consider the particular evidence and determine if "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." Shaker Hts. v. Mosely, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶11; accord Deanda at ¶6; State v. Evans, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶13.   However, a lesser included offense instruction requires more than "some evidence" that a defendant may have acted in such a way as to satisfy the elements of the lesser offense.   State v. Shane, 63 Ohio St.3d 630, 633, 590 N.E.2d 272 (1992).

{¶ 63} In the case at bar, the state charged appellant with aggravated murder under R.C. 2903.01(A) and (B) and murder under R.C. 2903.02(A).   R.C. 2903.01(A) and (B) provide:

> (A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
> (B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

{¶ 64} R.C. 2903.02(B) provides:

> No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

An "offense of violence" includes aggravated arson and arson.   R.C. 2901.01(A)(9).

{¶ 65} R.C. 2903.04(A) sets forth the offense of involuntary manslaughter:   "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."

{¶ 66} "Involuntary manslaughter is always and necessarily a lesser included offense of

murder because murder cannot ever be committed without also committing or attempting to commit a felony or a misdemeanor." State v. Kidder, 32 Ohio St.3d 279, 282, 513 N.E.2d 311 (1987); accord State v. Campbell, 69 Ohio St.3d 38, 47-48, 630 N.E.2d 339 (1994).   An involuntary manslaughter instruction is not justified, however, unless the defendant convinces the jury that the defendant "lacked the purpose to kill required by the aggravated murder statute." State v. Scott, 61 Ohio St.2d 155, 167, 400 N.E.2d 375, 383 (1980); accord State v. Thomas, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988) (stating that involuntary manslaughter instruction appropriate "only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another").

{¶ 67} In the case sub judice, we believe that the evidence does not reasonably support an acquittal on aggravated murder or murder and a conviction for involuntary manslaughter.   The evidence shows that the victim was brutally struck in the head with a hatchet and stabbed multiple times.   According to the coroner, these injuries alone would have caused the victim's death. Appellant, however, hastened the victim's death by burning him alive inside the vehicle. Moreover, even if appellant believed the victim was dead before he set the fire, appellant already participated in the events that caused the victim's other life-threatening injuries.   None of appellant's acts reasonably supports a finding that appellant caused the victim's death simply because he was trying to destroy evidence.   Instead, appellant's acts demonstrate a deliberate act to kill the victim.   See State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶137, quoting State v. Jester, 32 Ohio St.3d 147, 152, 512 N.E.2d 962 (1987) (stating that "'where an inherently dangerous instrumentality was employed, a homicide occurring during the commission

of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill'"). Consequently, because the evidence does not suggest that appellant "lacked the purpose to kill required by the aggravated murder statute," an involuntary manslaughter instruction was not justified. Scott, 61 Ohio St.2d at 167.

{¶ 68} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's fourth assignment of error.

V

MANIFEST WEIGHT

{¶ 69} In his fifth assignment of error, appellant contends that his aggravated arson conviction is against the manifest weight of the evidence. He argues that the evidence fails to show that he knowingly created a substantial risk of serious physical harm to any person other than himself.

{¶ 70} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider witness credibility. A reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. E.g., State v. Issa, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); State v. DeHass, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Once the reviewing court finishes its examination, the court may reverse the conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶ 71} If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence.   State v. Eley, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus.   Generally, a reviewing court should find a conviction against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the conviction.'"   Thompkins, 78 Ohio St.3d at 387, quoting Martin, 20 Ohio App.3d at 175; accord State v. Lindsey, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 72} In the case at bar, we believe that the state presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of aggravated arson had been established.

{¶ 73} R.C. 2909.02(A)(1) sets forth the elements of aggravated arson as charged in appellant's indictment: "No person, by means of fire or explosion, shall knowingly do any of the following:   (1) Create a substantial risk of serious physical harm to any person other than the offender[.]"

{¶ 74} The only element that appellant challenges is whether the state presented substantial evidence that he created a substantial risk of serious physical harm to any person other than himself.   Appellant contends that because he believed the victim was dead before he set the fire, then he did not knowingly create a substantial risk of serious physical harm to the victim. Appellant fails to acknowledge, however, that he knowingly created a substantial risk of serious

physical harm to individuals other than the victim.   The evidence shows that an innocent bystander approached the burning vehicle to investigate.   This bystander undoubtedly could have suffered serious physical harm if the car exploded.   Moreover, being in proximately to the flames is in itself a substantial risk of serious physical harm.   Additionally, the bystander stated that every time he tried to approach the vehicle, "something up front, whether it be a tire, or whatever, would blow up."   Certainly, an explosion resulting from the fire presented a substantial risk of serious physical harm to the bystander.

{¶ 75}   Furthermore, appellant's actions created a substantial risk of serious physical harm to the fire and emergency personnel who responded to the scene.   State v. Powell, 132 Ohio St.3d 233, 2012–Ohio–2577, 971 N.E.2d 865, ¶138 ("The statutory definition of 'substantial risk of serious physical harm' to any person [in R.C. 2909.02] includes the creation of such a risk to firefighters.   See R.C. 2909.01(A) and (B)(1)(a)."); accord State v. Jewett, 10th Dist. Franklin No. 11AP-1028, 2013-Ohio-1246, ¶30 and ¶99, quoting State v. Poelking, 8th Dist. Cuyahoga No. 78697 (Apr. 11, 2002) ("While '[d]anger is an obvious occupational hazard for firefighters, * * * the General Assembly knew that when it enacted R .C. 2909.01(A)(1) and included emergency personnel within the class of persons who could be victimized by aggravated arson.'"); State v. Keough, 6th Dist. Lucas No. L-08-1073, 2009-Ohio-6260, ¶20 (concluding that defendant's aggravated arson conviction not against the manifest weight of the evidence when defendant created "a substantial risk of harm to the volunteer firefighters whose duty it was to respond and to put out the fire in his home").   Consequently, we conclude that appellant's aggravated arson conviction is not against the manifest weight of the evidence.

{¶ 76}   Accordingly, based upon the foregoing reasons, we hereby overrule appellant's fifth

assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

[Cite as *State v. Linkous*, 2013-Ohio-5853.]

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. & Hoover, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.